517-0032, People v. Diego Salazar Please the court. My name is Keith Kibler. I am a fellow practitioner from Marion. I represent Diego Salazar. I do not represent him in trial nor in his appellant brief, but I'm representing him for the purposes of today's oral argument. In 2015, Diego was convicted of two counts of sexual assault. The facts of the case in the bench trial briefly were that two males and two females were out on a night, according to the alleged victim's testimony, of beast cruising. She testified that she had consumed some amount of something called Fireball, that she did not know how much she drank between leaving her home and the complaint of incident. All she said, all that she could remember was that she had had at least three beers. She testified that at 5 o'clock she was still drunk, 5 a.m. in the morning that she was still drunk, and there was testimony in the case in the record that they had arrived at Mr. Salazar's apartment, his residence, at somewhere between 3 and 4 a.m. the morning of the incident. So they arrived at 3 or 4 in the morning, and the alleged incident supposedly occurred around 5 a.m. She testified that she fell asleep and that she was laying in the bed beside Zachary, who was her former boyfriend. She testified that their relationship had ended previously, about six months before this incident. The testimony was consistent between her and Zachary and my client that he had fallen asleep at the base of the bed so that the victim, alleged victim, and Zachary were side by side and he was at their feet across the end of the bed. She testified that she understood that as a type 1 diabetic that alcohol was exacerbated by her diabetes. She said that she was awakened at 5 o'clock in the morning by her insulin pump ringing a bell or a bell noise off of her insulin pump. The way those pumps work is that at a preset level that the user of the diabetic pump has a needle under their skin. It continuously feeds microbursts of insulin, and if there is a problem with either the insulin runs out or there's a kink in the line or something, then it rings a bell. There was no testimony that this was the type of insulin pump that actually rang a bell if the blood sugar was too high or too low, and so that's simply not in the record. She said she was awakened by it ringing a bell, and why it rang a bell the court would have to guess because there's no indication in the record as to why that happened. But it was the reason she woke up. It was absolutely the reason she woke up. She said that when she woke up that my client, Diego, had his mouth on her vagina and fingers, plural, in her vagina. She said that her top was open and that she had her underwear on that were around her legs, above her knees, that she had on her skort, whatever the heck that is, and she could not... Do you know what a skort is? No, sorry. That's an old term. Well, I'm the old order. It's a skort. Well, you should know that. Oh, it's under the skort. Oh, okay. That explains what I was going to say. I'm not going to ask you, Your Honor, how you know that. I like this argument. This is fun. She said that her pants were, that her clothing was so tight on her legs that after she woke up that she did not attempt to pull her clothes up, that they were that tight on her legs. She testified that her knees were not up, her legs were not being held apart in any manner whatsoever, and she said she woke up and that my client's mouth was on her vagina and that he had plural fingers in her vagina, and she said, get the eff away from me. She said that he then left. The testimony of the boyfriend that was supposedly an ex-boyfriend, Lane DeCypher, said that he was awakened by... Mr. Kilburn, let me interrupt you a minute just because I know your time is limited. I have some questions. I'll talk with her. I think we all really know the facts of the case. The first issue that your client raised is whether or not the testimony of Dr. Tracy, C-R-E-A-C-Y, was in the record. I think it was Tracy, but again, I wasn't a trial lawyer. The state is arguing forfeiture because there was no post-trial motion that raised the issue, so that you're kind of stuck with plain error. You heard that? Well, for the purposes of the argument solely on that... On Tracy, Dr. Tracy. On Dr. Tracy, issue one, I am stuck with plain error because the trial court, the trial judge, the trial lawyer, there you go, I got the right thing, the trial lawyer did not file a post-trial motion. Okay. So if we are in plain error in that context, then the first thing that our court has to determine is whether an error occurred. Okay. Tell me why admitting the testimony of Dr. Tracy in light of Rule 803B-4, it's actually 4B, it was miscited in the record, or in the briefs. It's 803-4B, where statements for the purpose of medical diagnosis or treatment are miscible. Why... I think that's really clear, and I don't mean to be dismissive. It's really clear because it wasn't for the purposes of treatment. This happened at 5 o'clock in the morning. Later that day, on that same day, she went and reported what she said that she had told the other witness that she had been raped. She said that she had literally been raped, and the police sent her to this doctor, not for treatment, but for the purposes of a rape kit. Well, what else would a doctor do if she determined that there was rape? Well, if she had been raped and harmed, he would have at least examined her. The testimony... So you don't think a rape kit is an examination? Well, this is how much... It was examined to see if she was raped, and she was not. There was no evidence of rape whatsoever. I guess the social issue for me here is when a doctor generates a medical report, is the court now going to have to read it and determine whether or not a physician was recording statements for purposes of medical diagnosis or treatment? I have a problem with the evidentiary rule. Well, the statute says treatment. It uses that phrase. No, but ever since the case of Wilson v. Clark, statements of patients made to physicians are admissible. And I think that Rule 8034B is really probably a culmination of that Wilson v. Clark line of cases. Granted, it's not a criminal case, but it is all the civil cases that have arisen on admissibility of information that's contained in a medical record. If it was given to a doctor, it's deemed reliable. So I don't know how we get from all the case law about reliability to this rule. Are we going to start cutting hairs now as to what is treatment, is a rape kit treatment? Do you want us to do that? No, but I do say that the statute says what the statute says underneath the rule. And so with all due respect, the legislature needs to change that if that's what they want to do. But they have chosen not to do that, and we're stuck with that. Well, I think it may be the Supreme Court. Okay, right. But regardless, I understand what you're saying. That's what I'm saying. This was not that same day. This was the next day. Right. And so if you go through and you look at all the different factors that those cases talk about, about there being a gap in time, I got the next 5 o'clock in the morning until sometime the very next day, not for the purpose of treatment. The testimony in the record itself states that she was badly bruised on her lower body from an accident having nothing to do with this. And the doctor admitted that he didn't even examine her enough to find out about the bruises or ask them. He just met with her for the purpose of the rape kit. Okay, well, and I realize your time is up, but I have another question. I'm standing at your discretion. And I certainly will give Mr. Daly additional time if he needs it. But I want to ask you this about the same issue. The state looks at the provision with regard to Rule 703, the rule of evidence, and Rule 803-4A, which is different than the one you're looking at, and says that because the client was charged with certain crimes that this testimony becomes admissible. What do you say about that? I think that the 803 or 804-A controls. You do? Okay, good. All right. Thank you very much. Mr. Daly? Good morning, Your Honors. May it please the Court, Counsel, for the record, my name is Patrick Daly. I'm here on behalf of the state. We'll just jump right into that issue of 803-4B. First of all, I do want to start with plain error. I agree and disagree with the plain error analysis application here. I agree that the issue has been forfeited, and therefore plain error would be the motive attack that the defendant would have to pursue before this Court. However, plain error in the jurisprudence of the Supreme Court on the plain error rule makes it clear that the burden of establishing plain error is on the defendant, and for the defendant to establish plain error, the defendant has to assert plain error. For the defendant to assert plain error, it has to be asserted before this Court. It has not. It has not been raised in defendant's opening brief. It has not been raised in defendant's reply brief. It hasn't been raised at all. It's not my obligation, obviously, to raise it and then refute it. It's the defendant's. So from our perspective, his initial approach here or argument that this has been procedurally defaulted by the defendant in whole should not be addressed by this Court at all. Of course, that's not always a satisfactory answer for oral argument purposes, so we'll proceed with also discuss here the application of this rule. To get a little bit to what you were speaking about earlier, Justice Gates, if you look at the history of this particular language, actually, if you roll back to 725 ILCS 115-13, which has the identical language that you see in the Illinois Rule of Evidence 8034B, 115-13 is actually a narrow codification of the common law rule, which permitted certain statements to be introduced as hearsay or as exceptions to the hearsay rule. What common law rule are you referring to? The common law rule regarding statements made to physicians in the course of treatment. It's discussed in the Pfallister case, Your Honor, in the Supreme Court. Which case? Pima v. Pfallister in the Illinois Supreme Court. It has a discussion of that. It's actually 115-13, and it discusses its codification of the common law rule. And that's a case cited in your brief? It is, Your Honor. We'll discuss it over the course of a couple of pages, actually. And the reason I do discuss it is because I think it's an interesting case, and the question, if you will, about this notion of treatment or examination or it's, you know, the issue had arisen in that context in 115-13 about oftentimes the duality of the procedure, both being a treatment or an examination plus an investigatory aspect. And what the Pfallister case held there was that investigatory purposes are not incompatible with treatment and diagnostic purposes as well. But the majority of this is discussed, but what the concurrence does mention, and I think it's important as a factual backdrop for Pfallister, is that in that case the child victim was escorted by an assistant state's attorney to Dr. Gianna St. Germain, who was a pediatrician in Carbondale, who often provides expert testimony in child sex abuse cases. So, you know, obviously before that court, you know, there was a clear investigatory aspect to it, but the Supreme Court found that there's an opposite compatibility. And I think that when you look at the testimony of the witness in this case, the doctor in this case, she did do a physical examination, she did do an examination, you know, a pubic examination, look for injuries and signs of trauma, things of that nature, and these are the types of things that doctors do in the course of an examination. Is there an investigatory evidentiary element to it? Yes. But when you think about it, when you look at 115-13, when you look at 8034B, which I would assert is the applicable rule of evidence in this case, because the defendant here was charged with criminal sexual assault, okay, was charged with 11-1.20. And therefore, when you see it codified in this manner in relationship to particular types of criminal offenses, there's an understanding and contemplation in its drafters that there is going to be part of a criminal investigation that is a component of this examination process. Let me ask you about a different issue then. Absolutely. The excited utterance rule. Yes, ma'am. For an excited utterance exception, I mean, this statement that was made, well, let me ask you this first. Sure. Did you claim forfeiture on the excited utterance? Same argument here, yes. All right. Same argument with plain error. Correct. Okay. So as to all issues evidentiary, actually all issues, you would claim forfeiture first, plain error, procedurally defaulted? Correct. Okay. Sort of the same thing, I guess. I guess we go home. But the excited utterance, it's clearly the statement related to the circumstances, but there is a section that requires an absence of time. Correct. What do you think about that? Well, it's interesting. I cite some cases in the brief that discuss gaps, if you will, between the time of the startling event and the transmission of the information. And what the courts emphasize in these circumstances is consideration of the totality of the circumstances. Here, what the court had at its disposal was an incident where a woman awakened and found, you know, a guy that she really didn't know before that previous evening with his fingers in her vagina and tongue in her vagina. Obviously, I don't think anyone questioned that as a startling incident. That would be highly invasive, and, you know, it speaks for itself. What she testified to is that after she basically told him to F off, she lay there fearful and scared, as she said. She didn't want to move. She pretended to be asleep. She really didn't want her, you know, Engleman to know what was happening, because I think she made the statement that she thought she might beat this guy up. He might beat him up. He might beat him up, too. She might, too. But what happened then, I think it was within about 10 minutes or so, Engleman was awakened by the defendant. They had to go through their roofing job, I think they had at the time. She then immediately got up, went to the bathroom, saw her friend, Sierra Buffa, and then basically it all came out. So I think when we look at the totality of the circumstances here, I think the judge can reasonably ascertain that this is a woman who was just completely freaked out. The freak outing did not dissipate in any time between this 10-minute time span from when the incident occurred to when she had run into her friend in the bathroom and basically cried and sobbed hysterically. It's the type of initial reaction that she was giving that's entirely consonant with the ongoing nature of a startling event. And so I think the trial court, in an exercise of discretion, because this court reviews this for an exercise of discretion, where the court views this discretion in making this testimony, that the court's decision to allow that evidence was not arbitrary or fanciful. It was entirely consistent with the understanding of the totality of the circumstances that she was still under the heat of excitement and trauma, if you will, of what had just happened to her being sexually assaulted. So I would argue, Your Honors, that that evidence was properly admitted. That's what I'm standing for, for sure. The judge went into great detail on his order. He did. And in sort of doing, you know, alluded to his consideration of mitigating factors and things such as, not mitigating factors, but things such as, you know, the time that it elapsed and why it, you know, so he addressed all of that in his order. Correct. Interesting. And I think it's one of those cases where a judge lays out there exactly what discretion and why he was exercising the discretion in there that he did. Could an argument be made that the incident actually had not completed the occurrence until after he had left the premises? I think you could make that argument because I think that while after this happened, he's still in proximity, there's still that notion of what's going to happen next. I mean, you know, if you look at it objectively, you're going to maybe say, well, it's already over. But from the woman's perspective, the victim's perspective, and that's how we're looking at this excited utterance type of situation, it's still a law while he's still there. She is pretending to be asleep. She doesn't want to have any interaction with this guy, obviously, it seems at that point. So I think that is a valid argument that could be made, I guess. With respect to the reasonable doubt argument, this Court is well aware of the standard review in that instance of deference to the finder of fact's findings, and that this Court can reverse only if the verdict of guilty was one in no rational trial or fact would arrive at. In this case, you have the victim's testimony. You have Ms. Brough's testimony, presuming that it's admissible, which I would, of course, argue that it is. You have the testimony of the Engelman, who had had a conversation with the defendant at work where the defendant had acknowledged, although described as consensual, to having had his fingers in her vagina and, I believe, sucking her breasts is another comment that he made. The Court may have to be... Let me stop you for a second. You said that his statement to Engelman was that it was consensual. However, wasn't part of his statement that they were interrupted by the alarm? Yes, Your Honor. And Judge Brandmeier even commented on that with regard to how, you know, if it were consensual, the alarm would not have stopped any activity. Right. Right. Okay. Thank you for your time, Your Honor. Thank you, Mr. Daly. Rubano? Mr. Daly says we should just go home because everything was not raised properly. Well, everything that we just discussed was raised, at least for the part that I could raise, underneath the reasonable doubt argument in my reply brief, every single thing, including the hearsay nature that I argued because I felt like I could do that. I really couldn't un-ring the bell as to whether or not the appropriate motion was filed at the time by the trial court. We understand your position. So I really... I made that clear. Thank you. Okay. And so everything else is in there in my reply brief underneath the reasonable doubt section of my arguments. But the plain error issue has to be argued on appeal or raised in the briefs. Okay. And according to Mr. Daly, it was not. I don't see it. How about in the reply brief? I did what I felt like I could do, which was raise it in the reply brief, and I raised everything I thought I could raise in the reasonable doubt section of my argument. Okay. Mr. Daly has, under the reasonable doubt argument, what he has not stated was that she clearly said that she was drunk at the time that she woke up. When her pump woke her up, she was drunk. And when asked how in the world could someone have their tongue in your vagina and fingers curl in your vagina when you have said that your clothes were so tight on you that you couldn't even pull them up without getting out of bed, her response was, I don't know, I'm not a sex offender. That's enough right there to hang your hat on a reasonable doubt. This entire procedure that she says happened, the entire incident that she says happened, happened within less than an arm's length from another person who was in bed that she had a relationship with, that she was concerned, had he known what the two of them were, she says, doing, that my client, according to Zachary, said was consensual, my client testified he didn't touch her in any kind of way. And so we have three different versions of the facts. Wouldn't that be a perhaps stronger argument to your client if he had said that everything that was going on was consensual as opposed to denying any activity? Well, I believe that he told the truth. And that's the strongest argument you can make as a defendant. I guess his strongest argument would have been not to testify at all and just set the mute. But he chose to waive that Fifth Amendment right and took the stand and said, I never touched this woman. In my point of practice, that's kind of a rare thing because nobody wants to testify. I have a lot of clients who have the right to remain silent, but just don't have the ability to. I thought I could make you joke and laugh at that. You did. But the bottom line is many of them do have the ability and choose not to testify. This man took the extraordinary step of making himself viable for his own testimony and testify. And I'd ask that you would either reverse this decision under either one of these arguments or send it back for a retrial. Thank you. Thank you very much for your arguments. Thank you, Your Honor. I haven't seen you in a while. Okay. This matter will be taken under advisement and we'll issue an order in due course. Thank you for your...